Mr. Rosenberg, the Chief Judge will return in just a minute, but when you're ready, we're ready to begin. So just step to the lectern and you can begin your argument. The Chief Judge will join us momentarily. All right. Thank you, Your Honor. The arguments are all recorded, and as a general practice, we all listen to the oral arguments a couple of times over. Well, it's not moving, unfortunately. Good morning, and may it please the Court. I'm Matthew Rosenberg for Appellant Creative Compounds. The most important issue in this case is the proper burden of proof that the District Court should have applied in analyzing CREATIVE's priority of invention defense. In this case, there are two issued patents. Unfortunately, they were assigned to two different examiners at the PTO. Otherwise, we might not even be here. The patents were co-pending at the PTO for nearly all of their respective file histories, with clearly interfering subject matter. Claim 1 of CREATIVE's 273 patent and Claim 3 of STARMARK's 373 patent are indistinguishable in scope. They both cover dicreatine malady. As this Court has held in the past, no interference is required to obtain the preponderance of the evidence burden of proof when you have co-pending, interfering patents. Frankly, an interference was never a realistic option in this case. The parties first discovered the existence of the interfering patents in August 2006. How do you deal with the rather clear statement in our Eli Lilly case that when you have an issued patent that was co-pending, you must either bring a formal claim under Section 291 or surmount the clear and convincing burden? My response to that is that the statement in Eli Lilly was clearly dicta, because Eli Lilly did not involve an interfering patents issue. It involved a claim of wrongful inventorship, and it was trying to correct the inventorship. The two cases that control here are Environ v. Furon and the slip-track systems v. Metal Light. And in fact, in Environ, which was the first case— But in each of those cases there was a clear agreement on the count, if you will, the interfering subject matter. They understood that they had clearly interfering subject matter, and so they proceeded on a different basis than we have here, right? I respectfully disagree on both counts. Why didn't you just bring a 291? You'd have to ask my predecessor counsel, unfortunately. But Environment says— Well, let's hypothesize that you don't do that, because you have a patent, so you're restraining everyone else in the market. You've got a certain benefit from this, and the only person you can't restrain is someone who has a patent with identical subject matter. Now you want to restrain them too. They have a patent. Don't you have to meet the clear and convincing evidence standard or comply with 291? Let's go back and figure it out. No, Your Honor. Not under Environ. Under Eli Lilly you do. In Environment, the parties in essence had drawn the count. They'd come together. They had said this is the precise overlapping matter in the inventions, and the district court judge had looked at it and said that looks right to me. So clearly you had the functional analog of the interference working for you. And in Eli Lilly the two things were absent. The language was there hadn't been judicial delineation, but the parties hadn't agreed. The parties hadn't given the district court notice of precisely what was going to be at stake. Priority for what were you looking for? And so what Eli Lilly is trying to cabin the environment situation to say the rule in environment is a very fine rule. You're not required. You can pass the formality of a little nice saying 291. But you've got to give the district court judge something that is in essence 291 so he knows how to start. I mean this trial judge, if you haven't read the entire record, it was you made one reference to Environment in your reply to their motion for summary judgment. They came back in their reply to you and just ducked the whole issue. You didn't go back to the judge and tell the judge that he was terribly wrong. The judge after the entire adjudication was over said even if I'd had a preponderant standard, I would have come out the same way. Well, I believe, well, those are two separate issues. I know that. But doesn't that latter point undercut your case? I don't. The trial judge said even if I'd applied preponderance, you're going to lose anyhow. You didn't have any experts in here. You can't, you know, you're not benefited by a lower burden of proof. Well, that gets the whole next issue of the case, which is even if, and my argument is that even if there is a clear and convincing evidence standard, summary judgment was granted improvidently because if you look at the facts in the light most favorable to creative, there's clearly genuine tribal issues of fact here. Even using the clear and convincing evidence standard, creative has the documentary evidence to show that it invented first. Starmark doesn't have that. I do, with your permission, I would like to go back for a second on Environ. Environ, yes, there was an agreement by the parties of what the interfering, the scope of the interfering subject matter was. But there was no formal invocation of Section 291. However, in the slip track systems case, there was not an agreement on the scope of the interfering subject matter. There, that's what the parties said, you know, we believe we have interfering sub, patents here, but we don't know what this. Why don't we make it the language of the slip track where we say it's necessary for us to hold that given interfering patent, a single description of the interfering subject matter is necessary. A single description of the interfering subject matter is necessary for a determination of priority. We didn't have that in this case. Well, it's something that we submitted to the court, as you pointed out in our brief on the summary judgment, and it's something that I argued, and as you pointed out, that Starmark ducked in its, in its. And this language in slip track to me is harking back to what happened in Environment to say the parties had drawn the count. And they, the, the rules of engagement in front of the District Court were clear. This is a priority contest, and it's like it would be if it had been an interference. That was clear. That was what was happening in Environment. And we said, and Eli Lilly, if you want to have that happen, you have to do the same thing. You have to draw your count. But it's, it's clear in this case, too, that that's what we've been talking about all along. Well, we're. In, in the Vegas Generalities. Where we're in this case was just set up as, as an interference. This was argued as a, simply validity. Well, the whole, the whole time the parties have been discussing that we've got these, both before the Court and with each other, that we have these competing patents. They both cover. I agree. Between Mallet and, and. I agree, but they're arguing, you know, my patent's valid, your patent's not. And it was not structured or set up or teed up for the Court as an interference where parties would submit evidence to show conception, reduction of practice, all that. And, and that's what distinguishes this case from Environ and SlipTrack, does it not? I, I think it's a, I, I don't think that is the case here because it was, it was strongly argued in the summary judgment briefs and, and even more so at oral argument. And I believe the entire transcript is, is in the record here in the joint appendix. But it was, it was strongly argued that that is exactly what we have here. And in fact, the, the only way that they could prove infringement, their, their expert witness said, oh, Creator's product infringes because it's di-creatine malate. You know, that's, that is the scope of their Claim 3. And, and, and, and that's why I also think that under, you know, even if you, if you do look to the distinction between this case and Environ and SlipTrack, and in this case you, you have clearly two claims with identical subject matter, and that is an issue of law under Markman. I, I, I think if you look to- The point is you're, you're trying, you're making the argument that the Court should apply a different standard because this is an unusual circumstance where there's interfering subject matter, and this should be treated as an interference, even if it's not set forth as a 291 proceeding. That is exactly my argument here. But you've got, but you've got guidance from both Environ and SlipTrack that informs that to do that, you've got to, you simply can't sort of let these concepts float willy-nilly around, that you've got to give the District Court some guidance and some assistance and set it up as an interference. Turning to the, to the merits, don't you have trouble that the, of the summary judgment now, don't you have trouble showing that the e-mail evidence shows the structure of dicreatine malate and it doesn't show a means of making it under Oka versus Yosef, and you don't have corroborating evidence, so you'd go three strikes and you're out there, wouldn't you? Well, the e-mail is corroborating evidence, and the e-mail does discuss dicreatine malate by name, and, and to say that that's not the invention, I mean, that doesn't disclose the invention is to say sodium. You have a structure, though, in the chemical area. Again, that goes back to how they proved infringement, is that, you know, the only way they can prove infringement is because dicreatine malate means one thing. And in fact, here's a very interesting point. But do you have a method of making it? They tell the manufacturer you would make it the same way you would make creatine citrate. And that's something that somebody of ordinary skill in the art, they already know how to make creatine citrate, and that's said in the e-mail, said, you know, we suspect you'd make this the same way you'd make creatine citrate. But here's a very interesting point, is that in order for Starmark to have priority in this case, they need the effective filing date of their provisional application. Their provisional application doesn't have any formulas either. Their provisional application simply says creatine malate. They say actually dicreatine malate and tricreatine malate. And later the inventor discovered, oh, wait a second, tricreatine malate is a chemical impossibility. But the only way that they get priority is if they can claim a filing date from their provisional application. But their provisional application doesn't do anything more than say dicreatine malate. What those e-mails really say is that the means of making it would be nearly the same as creatine citrates, right? Yes, Your Honor. Nearly the same? Yes, something within the grasp of somebody of ordinary skill in the art. But, again, you haven't described a, you haven't shown possession of a means of making it. If anything, that statement is an admission that we don't have the way of making it. It should be nearly the same. Well, do you have it? No, but it should be something. That's almost an admission against you, isn't it? Well, at a minimum, it shows a conception of the invention followed by a diligent reduction to practice. And that's the keystone to inventorship. So I'm well past my rebuttal time. I'd like to reserve. Okay. Would you like to save the rest? Yes, please. Thank you, Mr. Rosenberg. Thank you. Mr. Tesi? Tesi, Your Honor. Tesi. May it please the Court. Your Honor, it's picked up on a critical fact, and that is that this whole case turns on an e-mail. And I understand what my learned friend is saying, but I would have expected to see before trial an expert report from an expert saying that I reviewed the e-mail, that dicreat and malleate, the word dicreat and malleate means X, Y, and Z, and therefore that's why this is conception and reduction to practice. They didn't produce any expert reports prior to the deadline, and in fact produced no expert reports. And then even after we're granted leave to respond to a summary judgment motion by Judge Golub so that the next set of lawyers could get involved, the expert report by Dr. or Mr. Britton, which they submitted, did not even address this specific fact. It wasn't until page 9 of their reply brief in this case where they finally sit down and say basically this is the count. Now, whether or not they're supposed to actually specifically say that this is a 291 case, even if they say it or don't say it, they have to litigate it that way, and they did not. They never identified the common claimed subject matter. They never identified what it would be. And the reason is clear why they didn't, because if you look at page 9 of the reply brief when they start talking about all this chemical stuff, which I got a D in in college, I don't understand. It's really subjective and necessary to have expert testimony on this, and this is a far cry from what they could corroborate, because under Price v. Schmack, even under preponderance statements, they still have to corroborate the inventor's testimony. They can't corroborate the very thing, count that they now say should have been litigated. Can I switch with you to infringement for just a minute? Sure, Your Honor. Now, you're relying on the Perlmutter report for infringement, right? Yes, Dr. Perlmutter's report, yes. And yet, in claim 8, we have here a statement that the characteristics and composition are consistent with having been done under the method. Correct, Your Honor, because what happened is- It's consistent, but, I mean, that's, in order to have infringements, you've got to say it meets each and every element of the claim. And he says, well, it's consistent with that. Absolutely, and because you have to- It's the same point. It's an admission of error, isn't it? No, it's not. It's a little different under the facts of this case. In this case, Creative was requested under the interrogatories to produce the method by which they make the device, they make the product. Dr. Perlmutter referenced that in his report. Creative failed to present, refused to present that evidence in discovery, refused to present their methods of manufacturing discovery. Today is the first time I've heard references to how they did it. The reason why Dr. Perlmutter stated that it was consistent with, because our argument defined in the District Court under Rule 37C of the Federal Rules of Settlement Procedure, the District Court, first of all, Creative cannot rely upon how they really create this product because they refuse to produce their methods in discovery. So that is why Dr. Perlmutter's report says consistent with, as opposed to it does to a reasonable degree of scientific certainty. Doesn't it show that he's not sure? Well, it shows that under the record in this case, he wasn't provided with sufficient evidence from Creative to make a determination. So I guess the answer to your question is he's not sure because he wasn't given everything that he would need by Creative. And when I was a prosecutor, I used to say that's like killing your parents and then pleading on the mercy of the court because you're an orphan. Creative, having not provided the information, was not really in a position at that point to contest Dr. Perlmutter's determination. But is it enough for them to say, well, most likely this is how it's done? Well, no. To meet the burden of proof by a preponderance of the evidence, if he had gone to trial, Dr. Perlmutter would have said, consistent with my observations, this is what I see. And then the jury would have been instructed that they can draw an adverse inference against Creative because they failed to produce the evidence of how they created it, that it would have been different. And their expert never even opined on this. They never provided the information. And even in their late submitted expert report. Your argument that somebody comes along and says, the expert says, well, I think the defendant most likely performed the method, then you think that shifts the burden to the patentee to come in and? No, Judge. I haven't done a good job. That's not my argument. No burdens are being shifted? No, no. The question was whether or not if somebody comes in and says, well, I think this is most likely what happened, is that sufficient to carry the day to say, well, the method was performed? In a vacuum, the answer is no. It would not be. It would not be sufficient. That's what I was trying to get at, how you were getting out of the vacuum. How was I getting out of the vacuum? I was letting the air in, Your Honor, because under the circumstances in this case, Creative was asked to produce in discovery their methods of manufacturing. They refused. And under Rule 37C, they cannot refute Dr. Perlmutter's report based upon any facts or information or expert testimony, having refused to provide that information during the discovery phase. That's how you get out. Because Dr. Perlmutter's report, Dr. Perlmutter was very straightforward. I don't have how they manufactured because they refused to turn it over. But he indicated that consistent with the structure, the methods of manufacturing would meet Claim 8. And, again, no contest from the other side about Claims 1 through whatever the alleged claims, the inference claims 1 through 7 on the product claims. This had to do with the method claims. And your contention is that you'd have the same result if this issue had gone to a jury? If the case had gone to a jury, what would have happened is Dr. Perlmutter would have testified that consistent with his opinion. He'd say the same thing as most likely the same thing. Right, exactly. And then Judge Gold would have instructed the jury that during discovery, Creative failed to produce discovery on how they produced their product and that the jury could draw an inference that the reason they did is because the evidence would have supported Dr. Perlmutter. That's under Rule 37C of the Federal Rules of Civil Procedure. That's an automatic exclusion. That's the way the game is played. I'm sorry, Your Honor? That's the way the game is played. You don't want to give it to me in discovery? That's fine. That's your business, but you're not going to use it at trial. That's the way the game is played. But back to this, whether or not Judge Gold applied the proper standard, Judge Gold also noted that irrespective of whether or not the standard was clear and convincing or by a preponderance of the evidence, and under the facts of this case, because there was no expert testimony to refute the validity claims of the Starmark patent, there was no expert or opinion testimony to refute the infringement contentions of Starmark, and there was no expert testimony or testimony in opposition to refute the invalidity of the Creative patent. Am I right to think with regard to the invalidity of the 273 patent, your expert witness gave a lot of testimony to invalidate many claims, but I didn't see any expert witness on your side to invalidate claims 6 to 9. Correct. He only invalidated certain claims. So didn't the district court judge strike 6 to 9 down? He struck down. He did, and that was an issue. That's incorrect. Yes, it was incorrect, but that issue was never raised in front of the district court. But, I mean, they're still entitled to 6 to 9, right? They are. There was no evidence in the record. Doesn't the current record show 6 to 9 as we speak are invalid? I can't remember as I stand here which ones he said were invalid. The judgment of the district court was all those claims were invalid. Correct. They were, and the district court was never given the opportunity. Justice would require that we restore 6 to 9. You know what, Judge? I think it would, because I think ultimately I can't sit here and tell you that we presented evidence that 6 to 9 were invalid, and it is on a claim-by-claim basis. Procedurally, the question is whether or not you can, because Judge Gold was never given this opportunity, despite the fact that he had the case for almost a year after this took place. So the answer is, you know, I mean, I can't contest that. I mean, I didn't present evidence to support the invalidity of those claims. I just don't have counsel that appreciates the facts. Well, Judge, you know, I teach. I teach my students, you know, when it comes time to eat it, you really can't nibble. So, I mean, I can't dispute that. Somebody probably should have told the district court judge when entering his final, you know, I'm not going to point at you, but somebody probably should have told him. We see these things all the time, where the district court judge, at the end of the trial, is tired. Somebody shoves a draft order in front of him. They sign it, and two or three things are being knocked out that shouldn't have. I should have done that, Judge. I can tell you I've had cases where I tribunalized with the government where there was no evidence to support a particular kind of an indictment, and we withdrew it. That's my job, and I probably should have done that. In retrospect, in this case, I should have done it as well. An issue was never raised. It's being raised now, and I can't refute it on the facts of the case. But back to what we're talking about, back to the issue about whether or not their patent is invalid, the other claims are invalid, or my patent is invalid. The only evidence that was ever presented was the e-mail. That's the only evidence. We're raising the issue so your adversary can have a chance to talk about it, and I'll rebut it because it didn't come up on direct. There's some question in this case as to whether or not the declaratory judgment jurisdiction on the challenge to the 273 is an issue in the case. Right? They never sued you for infringement. They did not. Right? They never threatened to sue you for infringement. Those are typically the threats that give rise historically to D.J. jurisdiction before Medi-Mu and even after Medi-Mu. So just tell me in a quick nutshell why the district court had D.J. jurisdiction over your counterclaim declaratory judgment. Because Judge Gold carefully looked at Medi-Mu and this court's cases that have come after it, and he applied the correct legal standard, which is whether or not there's a concrete and real dispute between the parties. Just tell me, in essence, what were the factors that had your client shivering in his boots? The letters that had been written by creative that are in the record in this case. I think one of them is 1194. The predecessor company? Yes. But it didn't directly go right to the predecessor company. Judge Gold found it. It narrows it to your company. Those letters say your company has ‑‑ it wasn't directed to you. No, but what the letter said and what Judge Gold found was that it threatened anyone who was going to sell die-creating malate and not get it from creative. Despite what creative now argues in this court, Judge Gold didn't say. But it doesn't say that. I mean, if it did, I think you'd have a better argument. It doesn't say we're out to stop anyone who's using this product. It just says your company is specific. No, Judge Gold went through a detailed analysis, and I was looking at the opinion this morning, and I think it's on page 22 or 24 of the appendix. Judge Gold specifically found that creative's language was directed to anyone who supplies other than creative. And what Judge Gold found, that even though it was SAN, even though it was a predecessor corporation, what he didn't find, which is what creative wanted to think, what he didn't find was that because the threats had been directed to SAN and Starmark was a successor in interest, that the threats ran to the succession. What Judge Gold found, and it was a factual attack, and they don't dispute the facts. But we're looking at these letters, and the letters say it has come to my attention that your company either had or does have die-creatine malate. Correct. Blah, blah, blah. Your company is pretty specific. But it went further. If I can get a second to grab a letter. It went further. It said that we will initiate litigation against anyone who supplies, who doesn't get this from creative. It went further. And Judge Gold found that the facts, that under the facts of this case, creative's conduct was sufficient to create a concrete dispute between Starmark, even though Starmark wasn't in existence at the time but was later, between Starmark and creative. That was a factual finding by Judge Gold. And creative doesn't dispute those facts or contest them on appeal. So even though the decision is de novo, this is a de novo, you always look at jurisdiction. Even though it's a de novo decision, there's no dispute about that fact, which was found by Judge Gold, which would be sufficient to support the declaratory judgment liability, which is what Judge Gold found in his opinion. If you look at, it's on page 25. How does the fact that creative filed a D.J. against your client, how does that fit into the standing on your counterclaim? Well, that's what happened. I mean, D.J. did sue my client. They sued Starmark. Starmark had filed and originally filed this case in Philadelphia. At the time that you filed your counterclaim is when we decide whether you had sufficient fear. Correct. That's the moment in time. And at that moment in time, you'd already been sued. Correct. By the party who's trying to say you didn't have any reason to be afraid. Right. But let's back up for a minute. First of all, those facts would go as to whether or not my client had a reasonable apprehension of being sued, which isn't the standard anymore. And secondly, and more importantly, this court has held even before MedImmune that an actual lawsuit or an express threat of a lawsuit is not necessary to create declaratory judgment jurisdiction. The only thing that has to be established is that there is a concrete and real dispute between parties of differing legal interests. And Judge Gold, looking at the time that we filed our counterclaim, you're right. When I filed my counterclaim, I had already had a D.J. action filed. Actually, we had originally sued under these circumstances in Philadelphia. The counterclaim that was asserted in Florida parroted, for the most part, the original complaint that Starmark had brought against Creative in Philadelphia. So at the time we filed the complaint in Philadelphia, we had already alleged that there was a dispute between the parties sufficient to support jurisdiction. Now you're talking about a D.J. plaintiff can create his own dispute by having earlier slugged someone. No, no. No, that's not what I'm saying. I'm saying a D.J. plaintiff can create jurisdiction because the actions of the patent owner give rise to a reasonable, a solid and concrete dispute. But in Prasco, we said there had been no concrete action, no affirmative action, specifically directed to the plaintiff's product. And in this case, there's no affirmative action taken against Starmark. No, no, no. But there was affirmative action taken by Creative that gave rise to a solid and concrete dispute between these parties. When they tell our customers, it's in the record. There were letters written from people saying. Letters to others. Where is the concrete dispute? Where is the affirmative action taken against you and your product? The dispute with respect to the 273 patent. I'm sorry, Judge Lynn. I interrupted you. That's all right. I'm sorry. Too busy interrupting. I'm just supplementing the Chief's question. Where is the dispute with respect to the 273 patent? Yes. The dispute with respect to the 273 patent comes about as a result of letters written by Creative. Not to us. To our customers. To people who bought in the industry. That Judge Gold found raised a dispute between Starmark, even though Starmark wasn't in existence at the time, between Starmark. And Judge Gold also found, a fact not contested by the defendants, that the dispute followed both the 373 and the 273 patent. So Judge Gold actually had two grounds on which he found that their conduct was sufficient to raise a dispute. And those facts have not been disputed. If the dispute relates to the letters, the letters were talking about enforcing the 273 patent, correct? Correct. What does that have to do with passage of title to the 373 patent? It doesn't. That wasn't my point. This Court, and we've seen this countless times, we all know that if a patent owner goes around and threatens my customers all day long, that if you buy from him, if you buy from him, if you buy from him, you're going to have a problem, that would give rise to a dispute. Just because I wasn't specifically threatened as the seller of the product, my customers were threatened. I mean, what's that great language from the Federal Circuit about this dance macabre with a sheathed sword? That's exactly what happened here. They wrote letters to our customers, and the letter said that anybody who buys not from us, I'm going to initiate legal action against. It was expressly stated in the letter. And under those circumstances, Judge Gold found that there was a dispute. Now, if you had an indemnification agreement, I'd agree with you, but threatening your customer is not enough to show that there's a dispute with you. Wait, Judge, you mean to tell me that if a patent owner goes around the country and threatens every one of my customers, that I, as a seller, don't have a dispute? Very simple way to create it. How's that? Indemnify. Wait, how would indemnify? Indemnifying, then they've got a dispute with you, because you're the one who's going to defend that. But until they come to you, you're just guessing it to whether there's no affirmative action against you. No, Judge, under MedImmune, if their actions give rise, if I'm going to lose sales... It has to be a legal dispute with you. Right. And I'm guilty of infringement because I've made offers to sell, right? And they go to my customers, and they say, if you buy from him, we're going to sue you. Now, you mean to tell me under those circumstances, I couldn't get a declaratory judgment? Read Prosko. Well, I can read Prosko, but I mean, I've been watching this Court for a long time. I find it difficult to believe that with the absent an indemnity... This isn't hard to figure out. They haven't taken any affirmative action against you. But even this Court has said that an affirmative action towards me is not what's necessary. That goes to whether or not there was a reasonable apprehension, which isn't the standard. We understand that, but you have to have a legal adverse interest. Where's the adverse legal interest? We couldn't sell, and we're losing sales, and I got a letter from Prosko to that effect. Now, that's an economic interest. We've explained that difference many times. Economic interests are not legal interests. So what you need is a legal interest. I'm not being a smart-ass, but other than economic differences, what do we fight about in front of this Court? I mean, we talk about money. I understand the difference. And there's the easy way to solve the problem, and that is to put yourself in a legally jeopardized position, indemnified. I understand. And you only have to do that with one. And, of course, now if you're quick on this, you'll say, ah, but then they'll just give us a covenant not to sue that particular party. I'm not that quick. I wouldn't have thought of that. Well, that's what they will do. Correct. But then, of course, you'll indemnify the next. And eventually they'll have to either take themselves out of any legal adverse action with you, or they'll have to indeed engage you. And, Judge, this is… But until that happens, we don't have an adverse legal interest. We've got a lot of economic concerns. You think, oh, I'm losing this or I'm losing that. But that's economic. We need a legal interest. Well, okay. Well, actually, in this case, what we have is a district judge who applied the proper legal standard under Metamu, who made facts… He invoked the proper legal standard. Correct. He has to have the facts to support it. And he found facts that he believed supported that legal standard, and those facts have not been contested by creative in this case. So I'm way over my time. Thank you. Thank you very much, Mr. Casey. Mr. Rosenberg. Thank you, Your Honor. I was going to get more into the subject matter jurisdiction, but I think that's pretty much taken care of. I would just mention one thing, and that is Starmark, unlike SAN, I really don't know a lot about SAN, but Starmark is a retailer. They don't sell bulk product to customers. They don't have any customers they could indemnify. I mean, they sell retail product to end users. They're not selling bulk dicreatine malate. So to say that letters were written to their customers is an absolute fallacy, and that's the first I've heard today that there's an allegation that we were sending letters to Starmark's customers. Back to the issue of priority of invention. In the methods of manufacture, Mr. Casey is arguing that, well, we didn't provide in discovery what our method of manufacture was, but as we pointed out multiple times, we don't have that information. That's something that we gave to the Chinese and said, here's dicreatine malate. Somebody of ordinary skill in the arts should know how to make this. It's two creatine cations. But he's correct, isn't he, that in a proceeding, the court will simply address an adverse inference to you. There absolutely should not be an adverse inference if we don't have that information. That's your product. It's not a question of spoiliation. Again, it's nothing that we have. It's not something that we have to give. You don't know how you make your product. We don't manufacture it. We're an importer. We import it from... Go ask. Hello. Is this Hong Kong? I believe it's China. Tell me how you make it. I believe it's China. Your clients went there, right? I'm sorry, yes. They know how to find it. On the other issue of priority of invention, the fact that there's no expert testimony... Actually, the inventor, Derek Cornelius, was designated as an expert witness. Because he's actually part of the company, he does not need a Rule 26A2 expert report. But under Sundance, there's no expert testimony. That's not an absolute requirement if this is something that doesn't require an expert understanding. And the priority of invention issue here doesn't require an expert understanding. There are other facts that support our priority of invention claim, and that goes into the whole Rodriguez timeline. I mean, if you look at the entire Julie Rodriguez issue, this is... Here's somebody that was working for Cornelius, knew about creatine-malate combinations, and that they were working on that. He says he didn't know that in his deposition, but that's clearly belied by his Internet post. You're saying that a lay person, hearing the words di-creatine-malate, knows what the structure is? Well, I... Because you didn't give the expert testimony. You didn't explain to him what it is. Well, I think... So if I'm the trial judge, I hear that, and I say, oh, I know what he means. Well, I... First of all, I think... Isn't that what you're going to have to prove? I think their expert witness has to say it if he wants to prove infringement. That's the only way he can prove infringement is to say exactly that. So they're going to have an expert witness on the stand who says exactly that. Di-creatine-malate means this and only this. Well, the difference is that they have an expert saying that. You don't. I think it's something Derek Cornelius can say, who's been designated as an expert. But, you know, it doesn't matter whether it's our expert that says it or their expert. Somebody, in order for them to win this case, has to say di-creatine-malate means this. Yeah, they have Perlmutter. Yeah. Where's your Perlmutter? I'll use Perlmutter's testimony. They can't win without Perlmutter, and I'm happy to use his testimony to say di-creatine-malate means this because they can't prove infringement without that. But then you look at the whole Joey Rodriguez timeline, and here he is. You know, while he's still working for Syntrax, in February of 2002, starts sending e-mails to Matt Bolt, clandestinely, stupidly using his work e-mail, which we later found out. But he's saying, you know, you have a job for me. Here's what's going on at Syntrax. Oh, and by the way, at the next industry convention, let's have this secret meeting. And then he goes, has this secret meeting. The only problem with relying on Perlmutter, of course, is that he doesn't explain the e-mails that are your evidence. So if you want to use their expert, unfortunately, he didn't testify on your subject. I think a layperson can put 2 plus 2. From their expert's testimony and Joey Rodriguez's e-mails, I think a lay juror would have no problem putting 2 plus 2 together and coming up with 4. All right. Thank you very much, Mr. Rosen.